UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 1:20-cv-22603-COOKE/GOODMAN

ERIC CHAVEZ, et al.,

      Plaintiffs,

v.

GRILL ENTERPRISES, LLC, et al.,

      Defendants.

_____/

REPORT AND RECOMMENDATIONS ON
PARTIES' CROSS-SUMMARY JUDGMENT MOTIONS

In this Fair Labor Standards Act ("FLSA") and Florida Minimum Wage Act
("FMWA") case, Plaintiff Erik Chavez ("Chavez") filed minimum wage claims against
Defendants stemming from his employment as a waiter at Defendants' restaurant and a
retaliation claim stemming from Defendants' alleged adverse employment actions
(including termination) against Chavez for asserting his rights under the FLSA. [ECF No.
7]. Plaintiff Leonel Diaz ("Diaz") -- also a waiter at the restaurant -- filed an opt-in notice,
joining in Chavez's FLSA and FMWA minimum wage claims. [ECF No. 39].[1]

_____

[1]      Defendants contend that Plaintiff Diaz joined only in Chavez's FLSA claim (Count
I) and not Chavez's FMWA claim (Count II). [ECF No. 95, p. 2 n.1). Alternatively,
Defendants argue that even if Diaz joined in both claims, Defendants are still entitled to
summary judgment in their favor. For the reasons discussed below, neither argument is

Plaintiffs have now filed a *renewed*² summary judgment motion, Defendants filed an opposition response, and Plaintiffs filed an optional reply. [ECF Nos. 100; 104; 108]. Plaintiffs also filed a statement of facts and Defendants filed a response to that statement of facts. [ECF Nos. 97; 103]. Additionally, each plaintiff filed a supplemental affidavit in support of their renewed summary judgment motion. [ECF Nos. 98-99].

Defendants also filed a renewed summary judgment motion. [ECF No. 95]. Plaintiffs filed an opposition response, and Defendants filed an optional reply. [ECF Nos. 105; 109]. Defendants filed a statement of facts and Plaintiffs filed a response to that statement of facts. [ECF Nos. 96; 102].

United States District Judge Marcia G. Cooke referred the instant motions to the Undersigned for a Report and Recommendations. [ECF No. 101]. For the reasons outlined below, the Undersigned **respectfully recommends** that the District Court **grant in part and deny in part** the renewed summary judgment motions.

## I.   Background

In the operative complaint, Chavez alleges the following causes of action against both Defendants: failure to pay minimum wages in violation of the FLSA (Count I); failure to pay minimum wages in violation of the FMWA (Count II); and retaliation in

---

persuasive.

²   As summarized below, the parties filed *renewed* summary judgment motions because Judge Cooke denied without prejudice their initial summary judgment motions. [ECF No. 94].

violation of the FLSA (Count III). *See* Amended Fair Labor Standards Act Complaint [ECF No. 7 ("Amended Complaint")].

Defendants filed an Answer and Affirmative Defenses. [ECF No. 22].[3] Defendants raised thirteen affirmative defenses, including the following affirmative defenses:

<u>THIRD AFFIRMATIVE DEFENSE</u>

Plaintiff and/or Defendants are not subject to and/or are exempt under applicable statutes. Plaintiff was not individually engaged in interstate commerce.

<u>FOURTH AFFIRMATIVE DEFENSE</u>

Plaintiff and/or Defendants are not employees or employers under the applicable statutes. Plaintiff was not individually engaged in interstate commerce.

*Id.* at 5.

On December 9, 2020, Diaz filed a consent to join as an opt-in plaintiff in this action. [ECF No. 39]. Therefore, as of that date, there were two plaintiffs in this case.

The instant cross-motions for summary judgment are the parties' *renewed* motions

---

[3] Defendants unsuccessfully sought leave to amend paragraph 7 of their Answer, where they denied that the corporate defendant met the $500,000 threshold for enterprise coverage under the FLSA. [ECF No. 57]. In their motion, Defendants sought to amend paragraph 7 of their Answer to admit that the corporate defendant, at all relevant times, had a gross annual revenue in excess of $500,000. *Id.*

The Undersigned denied Defendants' motion because they failed to establish good cause for modifying the Court's scheduling order. [ECF No. 89]. In fact, Defendants did not discuss Fed. R. Civ. P. 16 in their motion for leave, or otherwise address the good cause standard. *Id.* at 5. At the time, the calendar call was scheduled for December 8, 2021 and the trial was set for the two-week period commencing on December 13, 2021. *See* [ECF No. 42].

for summary judgment. Judge Cooke denied the parties' first round of summary judgment motions because Plaintiffs failed to show they were covered employees under the FLSA. [ECF No. 94].[4] Judge Cooke directed the parties "to file properly supported motions for summary judgment . . . addressing their entitlement to summary judgment on the issue of whether Plaintiffs were covered employees under the FLSA. *Id.* at 16.

Plaintiffs now move for summary judgment in their favor on the minimum wage claims (Counts I and II) of the Amended Complaint and on Defendants' Third and Fourth Affirmative Defenses, which claim that Defendants were not statutory employers and were not engaged in interstate commerce. [ECF No. 100].

In their renewed motion, Defendants seek final summary judgment in their favor on all claims based on: (1) Plaintiffs' purported failure to establish that the corporate defendant is engaged in enterprise coverage under the FLSA; (2) Plaintiffs' purported failure to show "that Defendants violated the minimum wage and/or tip credit provisions of the FLSA and/or that Defendants were not entitled [to] take a tip credit against the federal minimum wage"; (3) Plaintiffs' purported failure to show violations under the FMWA; and (4) Plaintiff Chavez's purported failure to adduce any facts or evidence supporting his FLSA retaliation claim. [ECF No. 95, p. 2].

---

[4]     Judge Cooke's decision can also be found at *Chavez v. Grill Enterprises, LLC*, No. 20-22603-CIV, 2022 WL 1642757 (S.D. Fla. Jan. 31, 2022).

II.      **Undisputed Facts**[5]

Plaintiffs and Defendants each submitted an initial statement of material facts. [ECF Nos. 96-97]. Both parties also submitted a response to the opposing party's statement of facts. [ECF Nos. 102-03].

**<u>Plaintiffs</u>**

Plaintiffs were waiters at Los Parrilleros, a restaurant and bar.[6] Los Parrilleros is operated as an Argentinian steakhouse and tavern.[7]

---

[5]      The facts are generated from the paragraphs in the statements of facts or responses to the statements of facts which the opposing party expressly agreed are undisputed. [ECF Nos. 96-97; 102-03]. For those purported facts which the opposing party classified as partly disputed, the Undersigned includes only the undisputed portions. The Undersigned sometimes changed the wording of an undisputed fact for stylistic and/or grammatical purposes. In addition, to enhance readability, I removed the specific record citations. They can be found in the source document, if needed.

[6]      In their own statement of undisputed facts, Defendants assert that "Grill Enterprises, LLC operates under the monikers 'Los Parrilleros,' a restaurant, and 'Parrilleros Tavern,' a tavern." [ECF No. 96, ¶ 1]. For summary judgment purposes however, this is a distinction without a difference. The Undersigned will refer to the restaurant and tavern collectively as "the restaurant" or "Los Parrilleros."

[7]      Plaintiffs also sought to add that many of the employees working at the restaurant were of Venezuelan national origin. [ECF Nos. 97, ¶ 11; 103, ¶ 11]. Although this fact is not disputed, Plaintiffs do not explain how this fact is relevant to their FLSA and FMWA claims. Therefore, it has been omitted from the "Undisputed Facts" portion of this Report and Recommendations.

Chavez worked at Los Parrilleros from 2013 until June 2, 2020. Diaz worked at this establishment from the pay period beginning April 26, 2018 until November 2019.[8]

**Defendant Grill Enterprises, LLC**

Grill Enterprises, LLC and Ruben Sierra bought the restaurant and tavern in 2015. Grill Enterprises, LLC had annual gross sales revenues in excess of $500,000.00 for the years 2015 through 2020.

Grill Enterprises, LLC employed people who on a regular and recurring basis handled, sold, or worked on goods and materials that travelled in interstate commerce.[9]

---

[8]   Diaz also worked as a busboy during 2013 and 2017. [ECF No. 97, ¶ 1, n.1]. This period of employment, however, is not relevant to the instant action.

[9]   Plaintiffs support this fact by citing to paragraphs 4-15 of their affidavits, where they, among other things, detail the ingredients, food, wines, and other beverages served/sold at the restaurant. [ECF No. 97, ¶ 5 (citing [ECF Nos. 98, ¶¶ 4-15; 99, ¶¶ 4-15]).

Defendants attempt to "dispute" these facts by arguing that Plaintiffs "concealed" them during discovery and, for this reason, they must be stricken and/or disregarded by the Court. [ECF No. 103, ¶ 5 ("Plaintiffs attempt to raise 'facts' never disclosed during discovery about the food and menu items (i.e.[,] 'goods' and 'materials') at the restaurant. These 'facts' not disclosed during discovery must be disregarded by the Court.")].

As evidence of Plaintiffs' alleged concealment, Defendants cite Plaintiffs' response to Defendant's Interrogatory No. 13, which states:

13.   If it is your contention that Defendants have income of $500,000 or more per year, or that Defendants are engaged in interstate commerce, or that you are engaged in interstate commerce or in the production of goods for commerce, please state in detail the basis for this contention and identify all documents pertaining thereto.

Most employees, including all wait staff (such as Plaintiffs), on a regular and recurring basis, handled, sold, or worked on goods and materials, which had travelled in interstate commerce. These "goods" included food and beverages from all over the world, which employees of the restaurant -- including each Plaintiff -- prepared, handled, sold and then served to customers of the restaurant for their consumption.

**Defendant Ruben Sierra**

---

> Answer: I am not aware of how much income the restaurant made for its owner per year, but the sales revenue is likely in excess of $500,000 per year, based upon sales during shifts I worked over the years. The documents which should reflect those revenues would include the sales receipts, bank statements and tax records of the restaurant and individual owners. **Additionally, the restaurant served international cuisine to clientele which included people traveling from other countries**.

*Id.* (emphasis added). Defendants' arguments are not convincing:

First, Defendants' argument that Plaintiffs "concealed" these facts (i.e., the types of ingredients, foods, and beverages served/sold at Defendants' restaurant) is not well-taken. At best, Plaintiffs can be criticized for failing to elaborate on what they meant by "international cuisine" served at the restaurant. However, it is impossible for Plaintiffs to have concealed from Defendants the types of food and beverages served/sold at Defendants' *own* restaurant. Defendants, as owners of the restaurant, know the types of food and beverages served/sold at their own restaurant.

Second, because Defendants have failed to directly refute these facts with actual evidence (for example, by filing an affidavit attesting under oath that the ingredients, foods, wines, and other beverages identified in Plaintiffs' affidavits were not *actually* served/sold at the restaurant), these facts are deemed admitted.

Ruben Sierra ("Sierra") is the sole owner of Grill Enterprises, LLC. At times, Sierra was present at the restaurant.[10] Sierra presided over at least one meeting in 2015.[11]

Sierra sometimes hired family members as managers. For a period of time, Sierra's wife was a manager. Sierra also hired his sister-in-law, Vanessa Carrillo, as a manager.[12] However, not all managers of the restaurant have been family members.

Sierra would personally introduce the managers to staff at open meetings.[13]

_____

[10]  The parties dispute whether Sierra had an office at the restaurant and the frequency and purpose of Sierra's visits to the restaurant. [ECF Nos. 97, ¶¶ 8-9; 103, ¶¶ 8-9]. According to Plaintiffs, Sierra was at the restaurant at least four times a week and had "complete autonomy over the operations of Grill Enterprises[, LLC]." [ECF No. 97, ¶¶ 8-9]. Defendants maintain that Sierra's visits to the restaurant were "sporadic" and "for the purpose of dining, not managing the restaurant." [ECF No. 103, ¶ 9].

[11]  The parties dispute the number of meetings over which Sierra presided and who coordinated and directed operations, including scheduling. [ECF Nos. 97, ¶ 12; 103, ¶ 12]. According to Plaintiffs, Sierra regularly presided over meetings with kitchen and wait staff. [ECF No. 97, ¶ 12]. Defendants admit that Sierra presided over one meeting in 2015, when he purchased the restaurant, but claim that "meetings with kitchen and wait-staff to coordinate and direct operations, including scheduling" were conducted by the manager. [ECF No. 103, ¶ 12].

[12]  According to Defendants, "the manager of the restaurant [was] in charge and in control of employees' employment and the restaurant's operations. The manager [made] the hiring and firing decisions and other decisions with respect to employees, including wages, hours, shifts, [and] assignments." [ECF No. 103, ¶ 10]. Plaintiffs refer to Ms. Carrillo as a "management surrogate." [ECF No. 97, ¶14].

[13]  Plaintiffs claim that the purpose of Sierra introducing managers to staff was "so that all employees were aware of the familial relationship between [Sierra] and his management surrogates." [ECF No. 97, ¶ 15]. Plaintiffs have failed to establish this fact for summary judgment purposes. First, Plaintiffs have not established that the restaurant's managers were in fact Sierra's surrogates. The degree of control Sierra

Sierra is responsible for signing Grill Enterprises, LLC's tax returns. He also signed a Payroll Protection Plan Loan Application for pandemic relief, in which he represented himself to be the sole owner of Grill Enterprises, LLC.

In this action, Sierra verified answers to interrogatories for Grill Enterprises, LLC and for himself, individually. Defendants also produced Sierra as Grill Enterprises, LLC's Federal Rule of Civil Procedure 30(b)(6) witness.[14]

_____

exercised over the day-to-day operations of the restaurant (either directly or by proxy) is disputed by the parties. Second, Plaintiffs' bases for this assertion are the affidavits of Chavez and Diaz. *Id.* However, Plaintiffs do not explain how they are competent to testify about Sierra's state of mind or motives when he introduced managers to employees.

[14]   Plaintiffs insist that because Sierra was Grill Enterprises, LLC's 30(b)(6) witness, this means Sierra was the witness with [the] most knowledge concerning the topics listed in the Rule 30(b)(6) notice, including "compliance with FLSA requirements." [ECF No. 97, ¶ 23]. Plaintiffs are mistaken. As the Court in *QBE Ins. Corp. v. Jorda Enterprises, Inc.* explained:

> [Rule 30(b)(6)] does not expressly or implicitly require the corporation or entity to produce the "person most knowledgeable" for the corporate deposition. Nevertheless, many lawyers issue notices and subpoenas which purport to require the producing party to provide "the most knowledgeable" witness. Not only does the rule not provide for this type of discovery demand, but the request is also fundamentally inconsistent with the purpose and dynamics of the rule. As noted, the witness/designee need not have any personal knowledge, so the "most knowledgeable" designation is illogical. *PPM Fin., Inc. v. Norandal USA, Inc.*, 392 F.3d 889, 894–95 (7th Cir. 2004) (rejecting argument that trial court should not have credited the testimony of a witness who lacked personal knowledge because the witness was a 30(b)(6) witness and "was free to testify to matters outside his personal knowledge as long as they were within the corporate rubric"). Moreover, a corporation may have good grounds not to produce the "most knowledgeable" witness for a 30(b)(6) deposition. For

### Payroll and Record Keeping

Plaintiffs have divided their term of employment into two periods (Phase I and Phase II). Phase I covers the time period beginning January 2, 2017 through January 2, 2019. Phase II includes the period beginning January 3, 2019 through the end of each Plaintiff's employment (June 2, 2020 for Chavez and November 2019 for Diaz).

### Facts Common to Phase I and Phase II

During both Phase I and Phase II:

1.  Customers of the restaurant regularly provided "tips" or "gratuities" (collectively, "tips") to Plaintiffs for their service as waiters;

2.  Plaintiffs reported their tips to the restaurant through an automated computer program, such that their "total tips" during any given pay period were recorded in shift report records maintained by the restaurant;

3.  The restaurant took the maximum "tip credit" allowed and memorialized

---

example, that witness might be comparatively inarticulate, he might have a criminal conviction, she might be out of town for an extended trip, he might not be photogenic (for a videotaped deposition), she might prefer to avoid the entire process or the corporation might want to save the witness for trial. From a practical perspective, it might be difficult to determine which witness is the "most" knowledgeable on any given topic. And permitting a requesting party to insist on the production of the most knowledgeable witness could lead to time-wasting disputes over the comparative level of the witness' knowledge. For example, if the rule authorized a demand for the most knowledgeable witness, then the requesting party could presumably obtain sanctions if the witness produced had the second most amount of knowledge. This result is impractical, inefficient and problematic, but it would be required by a procedure authorizing a demand for the "most" knowledgeable witness. But the rule says no such thing.

277 F.R.D. 676, 688–89 (S.D. Fla. 2012).

this practice in Plaintiffs' paystubs;

4.      From the tips generated by the Plaintiffs, they were required[15] to "tip out" 20% of their tips to the bussers, and an additional flat amount of (variably) $15-$25 to each "bartender" who worked during their shift.

5.      Because the vast majority of transactions between the restaurant and customers were credit card transactions, Defendants controlled[16] the disbursement of the tip revenues back to the Plaintiffs.

At all times, Plaintiffs received more than $30 per month in tips.

**Phase I (January 2, 2017 through January 2, 2019)**

During Phase I, on a biweekly basis (every other Friday), Defendants would issue a paystub and a supposed corresponding "paycheck" to the waiters (including Plaintiffs), purporting to pay them for the hours they worked. The paystubs showed that the restaurant took a "tip credit" in a gross amount from Plaintiffs' tips. The paystubs would total $0.00 or a negligible amount.

**Phase II (January 3, 2019 through the End of Employment)**

---

[15]     Defendants dispute the word "required," as used in this sentence. [ECF No. 103, ¶ 26d]. But, other than lodging their complaint, Defendants cite to no record evidence to support their objection to the use of this word. *Id.* "Federal Rule of Civil Procedure 56 requires a party disputing a fact to cite 'to particular parts of materials in the record[.]'" *Desire v. Jamalullah*, No. CV 120-150, 2022 WL 737465, at *1, n.2 (S.D. Ga. Feb. 10, 2022), report and recommendation adopted, No. CV 120-150, 2022 WL 736263 (S.D. Ga. Mar. 10, 2022) (quoting Fed. R. Civ. P. 56(c)(1)). Because Defendants have failed to meet their obligation under Rule 56(c)(1), this fact is deemed admitted.

[16]     Defendants object to the word "controlled" but cite no record evidence (or any evidence) to support their objection. [ECF No. 103, ¶ 26e]. Because Defendants have not met their obligation under Rule 56(c)(1), this fact is deemed admitted.

During Phase II, Defendants substantially changed the method they used to compensate Plaintiffs (and other waiters) in the following ways:

1.  Defendants no longer disbursed Plaintiffs' tips in cash on a daily basis. Instead, Defendants issued a single check or DD (with an actual value greater than $0.00) on the regularly scheduled payday. This amount consisted of a combined figure purporting to distribute both the disbursement of Plaintiff's tips and the payment of their reduced hourly wages.

2.  Defendants also prepared handwritten calculations for every pay period which purport to account for Plaintiffs' tip pool contributions ("Tip Pool Calculations"). These calculations reflected that Plaintiffs' total tips were reduced by the 20% tip out to bussers, the flat tip out to "bartenders," and an additional flat 3% reduction taken from Plaintiffs' tips to account for credit card vendor charges. By documenting the amounts each server paid for all of those "tip out" and vendor charges, Defendants then purported to disburse to Plaintiffs the "cash tips owed" reflected in their paystubs, which was the total tips minus less those described charges against tips retained by the restaurant.

3.  The tax withholdings reflected on the paychecks issued to the waiters no longer equaled the amount due on account of hourly wages. A single paycheck was issued to compensate for hourly wages at the reduced hourly rate, plus tips, less the tip pool contributions, reduced by the statutory tax withholdings based upon those earnings.

4.  During Phase II, some of the payroll records include the names of what appear to be entities (as opposed to individuals) including: Alejandro C. Chef, VIP Crew, Consultora Latinoamericana, Jacob Supply and T&S. *See, e.g.,* [ECF No. 98-7, p. 37].[17]

---

[17]   Defendants object to this fact by citing portions of Chavez's deposition testimony. [ECF No. 103, ¶ 28d (citing [ECF No. 96-2, pp. 74:15-75:8])]. In the cited portion of his deposition, Chavez testified that he did not know if bussers and bartenders were employees of Grill Enterprises, LLC or contractors and did not know how they were paid. [ECF No. 96-2, pp. 74:15-75:8]. However, Plaintiffs are not seeking to rely on Chavez's deposition testimony. Instead, they cite payroll records obtained from Defendants which

Plaintiffs have identified one person (i.e., Cesar Pacheco) who Plaintiffs frequently paid 20% of their tips to and who was not listed as an employee in Grill Enterprises, LLC's Employer's Quarterly Report filed with the Florida Department of Revenue. [ECF Nos. 98-8; 99-8].

Mariana Pinto also worked at the restaurant. At some point in time, she had the title of Assistant Manager.[18] Plaintiffs frequently had to pay a flat fee from their tips to Pinto as a "bartender." [ECF No. 97, ¶ 29c].[19]

---

list what appear to be entities. *See, e.g.,* [ECF No. 98-7, pp. 22, 25].

According to Plaintiffs, these were non-employees/contractors who worked as bussers, dishwashers, and kitchen workers. [ECF No. 97, ¶ 28d]. Defendants point out that dishwashers and kitchen workers did not take part in the tip pool and therefore their status as employees or independent contractors is entirely irrelevant. [ECF No. 103, ¶ 28d]. Defendants do not dispute, however, that Plaintiffs paid tips to bussers. *See, id.* at ¶ 27 ("Plaintiffs themselves controlled and retained all of their tips, except the amounts they tipped out to bussers (20%) and bartenders ($15-$25)."). On the other hand, Plaintiffs do not identify which of the listed entities were actually bussers and therefore participants in the tip pool. In any event, Defendants' payroll records include the names of entities, in addition to the names of individuals.

[18]     Plaintiffs state, in a conclusory manner, that Sierra hired Mariana Pinto (directly or indirectly, through Vanessa Carrillo) to serve as his surrogate Assistant Manager. [ECF No. 97, ¶ 16]. Plaintiffs cite their own affidavits. *Id.* (citing [ECF Nos. 98, ¶ 26; 99, ¶ 26]) However, Plaintiffs provide *no* factual basis for their assertion that Pinto was a mere surrogate of Sierra or that Sierra (either directly or indirectly) hired Pinto. Therefore, Plaintiffs have not established either fact for summary judgment purposes.

[19]     During his deposition, Plaintiff Chavez described Mariana's job duties as follows:

Q. What was Mariana's job at the restaurant?

Defendants also charged Plaintiffs a 3% fee for credit card transactions.[20]

**Chavez's Termination**

Chavez believes he was terminated by Grill Enterprises, LLC because: (1) he asked why his checks were made out for zero dollars and (2) he sometimes complained he had to use his own cash to make change for customers.

The restaurant closed for a period of time starting in March 2020 due to the COVID-19 pandemic. It then reopened for a period of time for take-out service only.

At the end of May 2020, Chavez became ill with the flu and took two to three days off to recover. The following week, on June 2, 2020, Vanessa Carrillo (the manager) told Chavez that his services were no longer needed.

III.     **Applicable Legal Standard**

On a motion for summary judgment, the Court must construe the evidence and factual inferences arising therefrom in the light most favorable to the nonmoving party.

---

A. She acted both as a manager and as a hostess. And sometimes as a bartender. Whatever was needed at the restaurant.

[ECF No. 96-2, p. 114:24-115:2].

[20]     Plaintiffs contend that the 3% charge was "greater than the percentage the credit [card] vendors actually charge the [restaurant]." [ECF No. 97, ¶ 29d]. The only evidence cited by Plaintiffs are payroll records reflecting the 3% charge imposed on Plaintiffs by their employer. *See* [ECF Nos. 98, ¶ 53d (citing [ECF No. 98-7, p. 39]); 99, ¶ 51d (citing [ECF No. 99-7, p. 4])]. They cite no record evidence concerning the actual percentage(s) charged by the credit card companies to the restaurant.

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Summary judgment can be entered on a claim only if it is shown that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In addition, under Federal Rule of Civil Procedure 56(f)(1), the Court may grant summary judgment for the nonmoving party "[a]fter giving notice and a reasonable time to respond." *See Gentry v. Harborage Cottages-Stuart, LLLP*, 654 F.3d 1247, 1261 (11th Cir. 2011).

> The Supreme Court has explained the summary judgment standard as follows:

> [T]he plain language of [Rule 56] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (internal quotation omitted).

The Court's function at this juncture is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). A dispute about a material fact is genuine if the evidence is such that a reasonable factfinder could return a verdict for the nonmoving party. *Id.* at 248; *see also Barfield v. Brierton*, 883 F.2d 923, 933 (11th Cir. 1989).

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions

of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323.

Once the movant makes this initial demonstration, the burden of production, not persuasion, shifts to the nonmoving party. The nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324; *see also* Fed. R. Civ. P. 56(c). To meet this burden, the nonmoving party "must do more than simply show that there is a metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). That party must demonstrate that there is a "genuine issue for trial." *Id.* at 587. An action is void of a material issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Id.*

"The standard . . . on cross-motions for summary judgment does not differ from the standard applied when only one party files such a motion." *Sec. & Exch. Comm'n v. Keener*, No. 20-CV-21254, 2022 WL 196283, at *5 (S.D. Fla. Jan. 21, 2022). "[O]n cross-motions for summary judgment, . . . [the Court] view[s] the facts in the light most favorable to the nonmoving party on each motion." *James River Ins. Co. v. Ultratec Special Effects Inc.*, 22 F.4th 1246, 1251 (11th Cir. 2022).

## IV.    Analysis

A.      **Plaintiffs' Renewed Summary Judgment Motion**

As noted above, Plaintiffs seek summary judgment in their favor on their FLSA

and FMWA claims (Counts I and II), on the issue of enterprise coverage, and on Sierra's

status as an FLSA employer. The Undersigned will first address the issue of enterprise

coverage, then Sierra's purported FLSA employer status, and, lastly, Plaintiffs' minimum

wage claims.

i.      **Defendant Grill Enterprises, LLC is an "Enterprise" under the FLSA**

The Eleventh Circuit has stated that:

> An employer falls under the enterprise coverage section of the FLSA if it 1)
> "has employees engaged in commerce or in the production of goods for
> commerce, or that has employees handling, selling, or otherwise working
> on goods or materials that have been moved in or produced for commerce
> by any person" and 2) has at least $500,000 of "annual gross volume of sales
> made or business done."

*Polycarpe v. E&S Landscaping Serv., Inc.*, 616 F.3d 1217, 1220 (11th Cir. 2010) (quoting 29

U.S.C. § 203(s)(1)(A)). The Undersigned will address the two prongs of enterprise

coverage in reverse order.

1.      **$500,000.00 Jurisdictional Threshold**

Defendants do not dispute that, at all relevant times, Grill Enterprises, LLC met

the $500,000 jurisdictional threshold. *See* [ECF No. 104, p. 3 ("Defendants do not contest

that they had gross sales over $500,000.")]. Therefore, the second prong of enterprise

coverage is met.

2.      **Defendants Employed Persons Who Regularly Handled Materials That Had Moved in Interstate Commerce**

Following the first round of summary judgment motions, Judge Cooke determined that Plaintiffs had failed to establish the first prong of enterprise coverage because the evidence submitted by Plaintiffs "plainly [did] not establish that Defendants employed people who regularly handle[d] materials that ha[d] necessarily moved through interstate commerce." [ECF No. 94, p. 11].

Judge Cooke found Plaintiffs' failure to meet prong one "disconcerting given that this case ha[d] been pending for almost two-years and, yet, to date, Plaintiffs ha[d] not demonstrated that they adduced any evidence to demonstrate that they or any of Defendants' employees handled materials that moved through interstate commerce." *Id.* She noted this was a "low bar" which Plaintiffs could have cleared "if they had come forth with evidence demonstrating that the food (or even just the ingredients used in those food dishes) and alcohol Defendants sold at their restaurant and tavern originated from outside the State of Florida." *Id.*

In their renewed motion (and supporting documents), Plaintiffs have remedied this oversight. They have filed supplemental affidavits from Chavez and Diaz attesting, among other things, that some of the food and beverages served at the restaurant came from outside of Florida. *See* [ECF Nos. 98, ¶¶ 11-13; 99, ¶¶ 11-13 (listing items, including sausages from Argentina; cheese from Italy; capers, olives, and olive oils from Italy and/or Spain; saffron from Iran, Spain, France, Italy and/or India; wines from Argentina,

France, Spain, Italy, and California; espresso and mineral water from Italy; beer from Holland and Mexico; and liquors from Canada, Scotland, Ireland, France, Tennessee, and Texas)].

Nonetheless, Defendants continue to insist that Plaintiffs cannot meet the first prong of enterprise coverage because the details provided in Plaintiffs' supplemental affidavits were not included in their discovery responses:

> Aside from a passing unsubstantiated reference to "international cuisine" Plaintiffs provided no evidence of out-of-state "goods" or "materials" used by Plaintiffs or other employees. But now in their affidavits, provided long after the close of discovery, Plaintiffs attempt to allege "facts" never disclosed during discovery about the food and menu items (i.e. "goods" and "materials") at the restaurant. These "facts" not disclosed during discovery must be disregarded by the Court.

[ECF No. 104, p. 4].

Defendants accuse Plaintiffs of "concealing" these facts by "not identify[ing] [during the discovery period] a single 'good' or 'material' used at Defendants' business that had travelled in interstate commerce" and "ambush[ing] Defendants with previously undisclosed information, in order to evade summary judgment (and also avoid inquiry as to the source of their 'personal knowledge' of the out-of-state nature of the goods and materials"). *Id.* at 5.

Defendants proceed to argue that "[t]he law is well-settled that failing to include responsive matter in discovery responses may result in exclusion of the omitted matter from evidence." *Id.* at 4 (citing out-of-district cases). They note that Plaintiffs knew from

Defendants' Answer and their Third and Fourth Affirmative Defenses that enterprise coverage was an issue in this case and yet Plaintiffs failed to "fully and completely" respond to discovery. *Id.* at 5. According to Defendants, had Plaintiffs provided the information contained in their supplemental affidavits during the discovery period, then "Defendants could have inquired into the foundation and basis of Plaintiffs' professed keen knowledge of the origin and previous out-of-state whereabouts of the food and menu items at Defendants' business." *Id.*

Defendants' arguments are not well taken. First, Defendants' claims of concealment and ambush are undermined by the fact that Defendants had access to the same facts as Plaintiffs. In other words, Defendants knew the ingredients, food, and beverages used/offered by their restaurant because Defendants own the restaurant. Second, Defendants were free, in opposing Plaintiffs' summary judgment motion, to file their own, competing affidavit(s) if the foods, ingredients, and beverages listed in Plaintiffs' supplemental affidavits were not in fact served/sold at Defendants' restaurant. They did not do so.

Moreover, Defendants' insinuation that Plaintiffs -- who were both waiters at the restaurant -- are not competent to testify about the food and beverages they personally served during their years' long period of employment is not persuasive. It does not take any specialized knowledge beyond the reading of packaging and labels to attest to the origins of some of the ingredients, foods, and beverages listed in Plaintiffs' affidavits. *See,*

*e.g.*, [ECF No. 98, ¶ 11(e)(i) ("The meat sold at 'Los Parrilleros' arrives in clearly marked boxes from Texas in the USA.")].[21] Surely, Defendants are not suggesting that saffron is locally grown in Florida or that there are vineyards producing Malbec wine in this state.

Courts in this District have noted the first prong of enterprise coverage can be met where ingredients or items used or served at a restaurant come from outside of Florida *See, e.g.*, *Torres v. Rock & River Food Inc.*, 244 F. Supp. 3d. 1320, 1330-31 (S.D. Fla. 2016) (granting plaintiff's cross motion for summary judgment on enterprise coverage where "the foodstuffs ordered [by the restaurant] [we]re materials and a reasonable jury could only conclude that the ingredients used by the [d]efendants crossed state lines and were regularly and recurrently handled by two employees"); *Garcia v. Pajeoly Corp.*, No. 18-CV-23399-CIV, 2019 WL 4540745, at *2 (S.D. Fla. Sept. 19, 2019), on reconsideration, No. 18-CV-23399-CIV, 2019 WL 5079560 (S.D. Fla. Oct. 10, 2019) ("[T]he undisputed facts show that La Ventana sold beer and food from other countries during this time, and that La Ventana had five to six employees working in the restaurant. Therefore, La Ventana is subject to FLSA enterprise coverage." (citation to the record omitted)); *Lopez v. Top Chef*

---

[21]     In *Walsh v. Freeman Sec. Servs., Inc.*, for instance, the court denied summary judgment for the defendants on the issue of enterprise coverage where "the Secretary [of Labor] ha[d] produced evidence from which a reasonable factfinder could determine that enterprise coverage exist[ed]," including "[t]he manufacturing tags on the [security guards'] uniforms [which] read 'Made in China' and 'Made in El-Salvador.'" No. 8:21-CV-217-VMC-AEP, 2022 WL 445501, at *6 (M.D. Fla. Feb. 14, 2022). The court in *Walsh* specifically noted that "[t]he manufacturing tags on the uniforms create[d] a reasonable inference that the guards' uniforms traveled through interstate commerce." *Id.*

*Inv., Inc.*, No. 07-21598-CIV, 2007 WL 4247646, at *2 (S.D. Fla. Nov. 30, 2007) ("The Court finds it reasonable to infer that some of the goods used in the [r]estaurant moved in interstate commerce before they were delivered to the [r]estaurant, so the first prong of enterprise coverage is satisfied.").

Here, Plaintiffs have each submitted an affidavit attesting to the ingredients, food, and beverages used or sold at the restaurant which came from outside of Florida. Defendants have not refuted Plaintiffs' statements that these ingredients, food, and beverages were used, served, or sold at their restaurant. Therefore, based on the undisputed record, Plaintiffs have met the first prong of enterprise coverage.

Given the unrefuted record evidence presented by Plaintiffs, the Court should find that Plaintiffs have met the first prong and, together with the conceded second prong, have established that enterprise coverage exists as a matter of law in this case.

### ii. Grill Enterprises, LLC was Plaintiffs' FLSA Employer as a Matter of Law

Plaintiffs seek summary judgment on the issue of Grill Enterprises, LLC being Plaintiffs' employer under the FLSA. The FLSA defines the term "employer" to include "any person acting directly or indirectly in the interest of an employer in relation to an employee[.]" 29 U.S.C. § 203(d). The FLSA's definition of "employer" is "broad" and "encompasses both the employer for whom the employee directly works as well as 'any person acting directly or indirectly in the interests of an employer in relation to an

employee.'" *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1298 (11th Cir. 2011) (quoting 29 U.S.C. § 203(d)).

In support of their argument that Grill Enterprises, LLC was their employer under the FLSA, Plaintiffs cite: (1) payroll records and time records demonstrating Plaintiffs worked for the restaurant; (2) Grill Enterprises, LLC's quarterly tax returns, listing the wages paid to "employees" every quarter, including Plaintiffs; and (3) tip pool calculations, which included Plaintiffs. [ECF No. 100, p. 10].

To the extent that Defendants address this argument, they do so in the context of Plaintiffs' purported failure to establish enterprise coverage against either Defendant:

> [T]o establish liability against Sierra, it is not enough that Plaintiffs succeed in arguing that Grill Enterprises[, LLC] and/or Sierra are their "employer," but rather, Plaintiffs must also establish that Plaintiffs were employed by an "enterprise" as that term is defined by the FLSA . . . . In this case, where Plaintiffs failed to prove "enterprise coverage" against Grill Enterprises[, LLC], not only must their claims against the corporate entity fail, but the derivative claims against Ruben Sierra must fail as well.

[ECF No. 104, p. 7].

However, and as discussed above, the unrefuted record evidence in the instant action establishes enterprise coverage. Moreover, in the absence of any competing evidence from Defendants, the undisputed record evidence cited by Plaintiffs -- including payroll records and quarterly tax returns -- sufficiently establishes as a matter of law that Grill Enterprises, LLC was Plaintiffs' statutory employer.

### iii.    Genuine issues of Material Fact Preclude Summary Judgment for Plaintiffs on Sierra's Status as an FLSA Employer

Plaintiffs also seek summary judgment in their favor on Sierra's status as an employer under the FLSA. According to Plaintiffs, "Sierra is individually liable as an officer and the sole owner of the business who clearly enjoys operational control." [ECF No. 108, p. 5]. Defendants dispute this contention. They argue that Plaintiffs are not entitled to summary judgment on this issue because "there are factual disagreements as to the operational control over Grill Enterprises, LLC exercised by Sierra." [ECF No. 104, p. 1].[22]

"The FLSA defines an employer as including 'any person acting directly or indirectly in the interest of an employer in relation to an employee.'" *Moore v. Appliance Direct, Inc.*, 708 F.3d 1233, 1237 (11th Cir. 2013) (quoting 29 U.S.C. § 203(d)). "[A]n employer is not only a company for whom the employee directly works but also includes 'any person who (1) acts on behalf of that employer and (2) asserts control over conditions of the employee's employment.'" *Cabreja v. SC Maint., Inc.*, No. 8:19-CV-296-T-33CPT, 2019 WL 2931469, at *3 (M.D. Fla. June 19, 2019), report and recommendation adopted, No. 8:19-CV-296-T-33CPT, 2019 WL 2929325 (M.D. Fla. July 8, 2019) (quoting *Josendis*, 662

---

[22]   Defendants also argue that because Plaintiffs purportedly cannot establish enterprise coverage for Grill Enterprises, LLC, then Plaintiffs' claims against Sierra should also be dismissed. [ECF No. 104, p. 7 ("[W]here Plaintiffs failed to prove 'enterprise coverage' against Grill Enterprises[, LLC], not only must their claims against the corporate entity fail, but the derivative claims against Ruben Sierra must fail as well.")]. However, and as discussed above, Plaintiffs *have* established enterprise coverage as a matter of law in the instant case. Therefore, Defendants' alternative argument concerning Sierra fails.

F.3d at 1298). "Whether an individual falls within this definition [of employer] 'does not depend on technical or 'isolated factors but rather on the circumstances of the whole activity.'" *Alvarez Perez v. Sanford-Orlando Kennel Club, Inc.*, 515 F.3d 1150, 1160 (11th Cir. 2008) (quoting *Hodgson v. Griffin & Brand of McAllen, Inc.*, 471 F.2d 235, 237 (5th Cir. 1973)).

"The overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages." *Patel v. Wargo*, 803 F.2d 632, 637-38 (11th Cir. 1986) (quoting *Donovan v. Agnew*, 712 F.2d 1509, 1511 (1st Cir. 1983)).

To hold an individual liable as an employer under the FLSA, he "must either be involved in the day-to-day operation or have some direct responsibility for the supervision of the employee," but that individual "need not have exclusive control of a corporation's everyday workings, so long as he has operational control of significant aspects of the corporation's day to day functions." *Angulo v. Il Gabiano Miami, LLC*, No. 19-21352-CIV, 2019 WL 6699684, at *2 (S.D. Fla. Dec. 9, 2019) (quoting *Gonzalez v. Metro. Delivery Corp.*, No. 10-23296-CIV, 2012 WL 1442668, at *8 (S.D. Fla. Apr. 26, 2012)).

In *Angulo*, for instance, the Court found as a matter of law that the individual defendants were not employers under the FLSA where they "spent limited time at the restaurant and were not involved with the employees, scheduling, or operations" and "[t]hese responsibilities were delegated to . . . the [c]ontroller, or . . . the [m]anager." 2019 WL 6699684, at *3.

On the other hand, in *Reddish v. Epoca Corp.*, the Court found that genuine issues of material fact precluded summary judgment on the issue of whether the individual defendant was an FLSA employer. No. 1:17-CV-21206-JLK, 2019 WL 5535390, at *6 (S.D. Fla. Oct. 25, 2019). In *Reddish*, the plaintiff claimed the individual defendant "directed [plaintiff]'s work, had the authority to hire and fire employees, managed the day-to-day operations of [the corporate defendant], directed [the plaintiff] on which job sites to attend, signed [the plaintiff]'s paychecks, and transported [the plaintiff] to and from job sites." *Id.* The defendants claimed the individual defendant did not "maintain employment records, . . . supervise or control the work of employees, . . . manage the daily operations of [the corporate defendant], or [have] the power to hire and fire employees," but merely "purchase[d] materials necessary for [the corporate defendant]'s construction projects." *Id.* Based on this disputed record, the Court denied the defendants' summary judgment motion.

Here, Defendants argue that the Court should deny summary judgment to Plaintiffs on this issue because "there still . . . remain factual issues as to whether . . . Sierra himself was Plaintiffs' 'employer' as that term is defined by the FLSA." [ECF No. 104, p. 7]. Specifically, Defendants note that:

> While Sierra is admittedly the owner, the restaurant is operated on a day-to-day basis by its manager. Sierra sometimes speaks to his manager as little as once per month. Further, Sierra does not maintain an office at the restaurant, his physical presence at the restaurant is sporadic, at best, and his presence is usually for the purpose of dining, not managing the restaurant. Sierra does not make it clear that he is in charge and he that [sic]

he has complete authority over their [sic] employment and the restaurant's operations. To the contrary, the manager of the restaurant is in charge and in control of employees' employment and the restaurant's operations. The manager makes the hiring and firing decisions and other decisions with respect to employees, including wages, hours, shifts, assignments, etc. Also, meetings with kitchen and wait-staff to coordinate and direct operations, including scheduling, were conducted by the manager, not Sierra. All scheduling was handled by the manager. Sierra did not resolve performance issues and conflicts among service employees and other employees or contractors who worked at the restaurant.

*Id.* at 7-8.

Plaintiffs argue that "[t]he record makes clear that . . . Sierra is the founder, officer, sole owner, and chief operator of a restaurant he operates and controls implicitly" and that "Sierra was and remains operationally involved, both directly and indirectly, in every operational aspect of the restaurant and holds himself out accordingly" and cite to certain portions of their statement of undisputed facts [ECF No. 100, p. 11 (citing [ECF No. 97, ¶¶ 8-23])].

However, many of the "facts" marshaled by Plaintiffs in support of Sierra's purported control over the day-to-day operations of the restaurant are not supported by *competent* evidence. For instance, Plaintiffs' affidavits are replete with references to Sierra's use of "surrogate" managers or a "surrogate" assistant manager. However, Plaintiffs fail to explain the basis for their belief that there was an alleged surrogacy. For example, they have not submitted evidence that the manager would not approve a schedule change without consulting with Sierra.

27

Plaintiffs also state, in a conclusory fashion, that "Sierra would specifically enforce the requirement that service employees contribute to a '[t]ip [p]ool' from the gratuities they earned, by making cash payments to bussers and bartenders." [ECF No. 97, ¶ 17].[23] To support this fact, Plaintiffs cite to Chavez's affidavit, which makes the same conclusory statement. *Id.* (citing [ECF No. 98, ¶ 27 ("Sierra himself would specifically enforce the requirement that '[w]aiters' contribute to the '[t]ip [p]ool' from the gratuities

---

[23]     This sentence is inartfully drafted because it can be read as Sierra "making cash payments to bussers and bartenders" *or* service employees "making cash payments to bussers and bartenders." What it means to say is that service employees (such as Plaintiffs) were required to make cash payments to bussers and bartenders. Although the above sentence is not a model of clarity, the record makes clear that Plaintiffs themselves and other service employees (not Sierra) were the ones who made the cash payments to bussers and bartenders. *See* Supplemental Affidavit of Chavez [ECF No. 98, ¶ 38 ("From the 80% (sometimes 90%) of the '[t]otal [t]ips' disbursed to me in cash, the Defendants required that **I then then [sic] also pay** – in cash – 20% of those tips to bussers, and an additional flat amount of (variably) $15-$25 to each 'bartender' working each shift; **I disbursed these 'tip out' payments on a daily basis**, **in cash, from my own Tips** disbursed by Defendants." (emphasis added))]; Supplemental Affidavit of Diaz [ECF No. 99, ¶ 37 (same)]; ECF No. 100, p. 16 ("Plaintiffs would receive cash from the Employer on account of their tips, **and then have to redistribute to others in cash**." (emphasis added))]; [ECF No. 108, p. 9 ("during Phase I[,] **Plaintiffs themselves distributed their tip pool payments to bussers and bartenders** from the net-cash tips they received from the employer. There is no suggestion in the record that Defendants made the tip pool distributions during 'Phase I.'" (emphasis added))]. In any event, Plaintiffs do not provide any factual support for the conclusory statement that it was Sierra who "specifically enforce[d]" the tip pool. [ECF No. 97, ¶ 17].

Additionally, Sierra disputes this fact in his unsworn declaration. [ECF No. 103-1, ¶ 9 ("I had no part in 'enforcing' the tip pool. The tip pool was managed by the employees themselves, as well as managers and payroll personnel.")]. Therefore, Plaintiff's statement that Sierra "specifically enforce[d]" employee contributions to the tip pool is both an unsupported, conclusory assertion and factually disputed by Sierra.

we earned, by making cash payments to bussers and bartenders.")]). Plaintiffs fail to explain *how* -- in what manner or what means -- Sierra enforced the tip pool contributions made by the waiters.

Plaintiffs also contend that "Sierra would occasionally resolve performance issues and conflicts among service employees and other employees or contractors who worked at the restaurant." [ECF No. 97, ¶ 18]. Plaintiffs do not provide any factual details or cite examples of instances when Sierra resolved performance issues or conflicts between the employees. Plaintiffs merely rely on the affidavits of Chavez and Diaz, which provide the same level of detail (or lack thereof) as the above conclusory statement, albeit in a sworn averment. *See* [ECF Nos. 98, ¶ 28 ("Sierra would occasionally resolve performance issues and conflicts among service employees and other employees or contractors who worked at the restaurant."); 99, ¶ 27 (same)].[24]

These conclusory statements, devoid of any supporting facts, are insufficient to meet Plaintiffs' burden, as the moving party, to show that they are entitled to summary judgment on this issue. The Eleventh Circuit "has consistently held that conclusory allegations without specific supporting facts have no probative value." *Evers v. Gen.*

---

[24]     Sierra disputes this fact in his unsworn declaration. [ECF No. 103-1, ¶ 10 ("I did not resolve performance issues and conflicts among service employees and other employees or contractors who worked at the restaurant, managers did.")].

*Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) (citing *Gordon v. Terry*, 684 F.2d 736, 744 (11th Cir. 1982) and *Broadway v. City of Montgomery*, 530 F.2d 657, 660 (5th Cir. 1976)).[25]

As further evidence of Sierra's operational control over the restaurant, Plaintiffs cite the fact that Sierra filed an unsworn declaration[26] [ECF No. 96-3], attesting to details concerning the restaurant's operation, including tips and wages during Phase I and Phase II, the three precent credit card surcharge, Cesar Pacheco's job functions, employees who were or were not managers, Plaintiffs' paystubs, the amount of tips Plaintiffs' received per month and the wages and tips paid to Plaintiffs. [ECF No. 108, pp. 5-6]. However, Plaintiffs ignore the other portions of Sierra's declaration. For instance, Sierra states that the manner in which wages and tips were calculated during Phase I was established by the previous owner of the restaurant. [ECF No. 96-3, ¶ 6 ("When Grill Enterprises[, LLC] first took over Los Parrilleros in 2015, it kept the same pay and tip pool system in place from the prior owners without any changes."). And, that Sierra does not specify who at Grill Enterprises established the compensation system during Phase II. *Id.* at ¶ 10 ("In

---

[25]    In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981), our appellate court held that all Fifth Circuit decisions issued before September 30, 1981 would become binding precedent in the Eleventh Circuit.

[26]    Title 28, United States Code, Section 1746, entitled "unsworn declarations under penalty of perjury," provides that a person may submit the statutory substitute to an affidavit, without the use of a notary, by including designated language, such as "I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct." Thus, an unsworn declaration complying with the statute is competent evidence to the extent that an affidavit is competent evidence to support or undermine a summary judgment motion.

January 2019, Grill Enterprises[, LLC] changed the payroll system so servers were paid their wages and tips by check, not in cash.").

Plaintiffs also ignore the second unsworn declaration filed by Sierra in response to Plaintiffs' statement of undisputed facts. [ECF No. 103-1]. In this second declaration, Sierra states that "the restaurant is operated on a day-to-day basis by its manager," whom he "sometimes speaks to . . . as little as once per month." *Id.* at ¶ 2. Sierra also attests that "the manager of the restaurant is in charge and in control of employees' employment and the restaurant's operations" and "makes the hiring and firing decisions and other decisions with respect to employees, including wages, hours, shifts, assignments, etc." *Id.* at ¶ 4. According to Sierra, with the exception of one meeting in 2015, "meetings with kitchen and wait-staff to coordinate and direct operations, including scheduling, were conducted by the manager, not [Sierra]" and "[a]ll scheduling was handled by the manager." *Id.* at ¶ 5.

The fact that Sierra has personal *knowledge* as to many of the details of the operation of the restaurant does not necessarily mean Sierra was personally *involved* in the day-to-day operation of the restaurant or had some direct responsibility for the supervision of employees. The fact that Sierra filed unsworn declarations in the instant case does not mean he was Plaintiffs' employer under the FLSA.

Plaintiffs also note that "Sierra was . . . produced as the person with [the] most knowledge regarding compliance with FLSA requirements." [ECF No. 108, p. 6]. This

argument carries no legal weight. Notwithstanding the language Plaintiffs chose to include in their deposition notice [ECF No. 97-1], there is nothing in Rule 30(b)(6) which requires a corporate entity to produce a witness with the most knowledge on a particular topic or topics. *See QBE Ins. Corp.*, 277 F.R.D. at 688-89, discussed *supra*. Moreover, the fact that Sierra was produced as the corporate representative during a Rule 30(b)(6) deposition does not establish that he exerted control over the day-to-day operations of that corporation.

Because Plaintiffs have failed to meet their burden at the summary judgment stage, the District Court should deny summary judgment on the issue of whether Sierra qualifies as an FLSA employer.

### iv. Genuine Issues of Material Fact Preclude Summary Judgment for Plaintiffs on Their Minimum Wage Claims

Lastly, Plaintiffs maintain that they are entitled to summary judgment on their minimum wage claims (Counts I and II). According to Plaintiffs, throughout specific periods of their employment: (1) their only compensation came from gratuities provided by customers; (2) the restaurant took an unauthorized tip credit without paying Plaintiffs the reduced hourly wage; (3) the restaurant kept portions of Plaintiffs' tips for its own use and benefit and (4) the restaurant required that Plaintiffs kick-back portions of their tips to the restaurant by requiring that Plaintiffs contribute to a purportedly invalid tip pool which redistributed the Plaintiffs' tips to non-employee contractors, management employees, and the operating expenses of the restaurant. [ECF No. 100].

Plaintiffs have asserted federal and state law minimum wage claims. At the outset,

Defendants argue (in opposition to Plaintiffs' motion and in their own summary

judgment motion) that only Chavez brings an FMWA claim because Diaz did not join in

Chavez's FMWA claim. [ECF Nos. 104, p. 9; 95, pp. 2 n.1, 12]. The Undersigned will

address this argument first.

### 1. Whether Diaz Joined in Chavez's FMWA Claim

This argument centers around Diaz's opt-in notice, which states, in its entirety as

follows:

**<u>NOTICE OF CONSENT TO OPT-IN PURSUANT TO 29 U.S.C. § 216(b)</u>**

1. **I hereby consent, pursuant to 29 U.S.C. § 216(b), to become a party plaintiff in this lawsuit**.

2. By choosing to join this lawsuit, I understand that I designate the representative Plaintiff(s) as my agent to make decisions on my behalf concerning the litigation, including entering into settlement agreements. These decisions will be binding on me if I join this lawsuit.

3. By choosing to join this lawsuit, I understand that I will be bound by the judgment, whether it is favorable or unfavorable.

4. I hereby agree to be represented by Anthony Sanchez, P.A. Law Offices, counsel for the representative Plaintiff(s).

[ECF No. 39-1 (emphasis added)].

According to Defendants, "Diaz only opted-in to the FLSA minimum wage claim,

not the FMWA claim" because "[a]s Diaz admits, [t]he FMWA does not include a separate

procedural mechanism for joining a minimum wage claim under the FMWA" and the

opt-in notice "did nothing to add [Diaz] to the FMWA claim." [ECF No. 104, p. 9 (citation and internal quotation marks omitted)]. According to Defendants,

> [i]n the absence of a statutory mechanism under the FMWA to join an FMWA claim (as exists under the FLSA for FLSA claims), it was incumbent upon Diaz to join the FMWA claim by other means (e.g.[,] an amended pleading, motion for joinder, etc.), as allowed under the Federal Rules.

*Id.*

"Arguments, especially those that seek to foreclose claims at summary judgment, must be supported by citation to authority and appropriate analysis." *Watts v. Silverton Mortg. Specialists, Inc.*, 378 F. Supp. 3d 1164, 1177 n.3 (N.D. Ga. 2019). Here, Defendants fail to support their argument with any case law or other legal authority. *See Romano v. John Hancock Life Ins. Co. (USA)*, No. 19-21147-CIV, 2022 WL 1447733, at *31 (S.D. Fla. May 9, 2022) ("A litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority or in the face of contrary authority, forfeits the point. The court will not do his research for him." (quoting *Phillips v. Hillcrest Med. Ctr.*, 244 F.3d 790, 800 n.10 (10th Cir. 2001))).

Because Defendants have failed to properly support their argument, the Court should find, at least for summary judgment purposes, that Diaz joined in both the FLSA and FMWA claims (Counts I and II).

### 2.     FLSA and FMWA Claims

The Undersigned will next address Plaintiffs' minimum wage claims. As noted above, Plaintiffs divide their employment period into two phases: Phase I and Phase II.

Plaintiffs assert that the manner in which they were compensated during Phase I violated the FLSA and the FMWA because Plaintiffs were compensated only from the tips they received and not from the reduced hourly wages Defendants were required to pay. [ECF No. 100, p. 15]. As evidence of this alleged improper pay structure, Plaintiffs cite to their Phase I paystubs which totaled $0.00 or a negligible amount. *Id.* at 12.

Plaintiffs further contend that during Phase I, "Defendants retained the Plaintiffs tips in an amount greater than . . . what they used to deposit on account of statutory [tax] withholding requirements." *Id.* at 15.

According to Plaintiffs, during Phase I and Phase II, they were required to participate in an unlawful tip pool which included persons who were not employees of the restaurant and management employees. *Id.* Lastly, Plaintiffs assert that during Phase II, they were improperly required to pay three percent for tips paid by credit card, which was more than the amount Defendants were charged by credit card vendors. *Id.* at 16.

Defendants, of course, maintain that "the tip pool Plaintiffs participated in complied with the FLSA and all applicable regulations." [ECF No. 104, p. 16].

For the reasons discussed below, genuine issues of material fact preclude summary judgment for Plaintiffs in either phase.

a. **Phase I: Defendants' Alleged Failure to Pay a Reduced Hourly Rate and Alleged Retention of Tips in Excess of Tax Withholdings**

"The FLSA requires that employers pay employees a minimum hourly wage." *Ash v. Sambodromo, LLC*, 676 F. Supp. 2d 1360, 1366 (S.D. Fla. 2009) (citing 29 U.S.C. § 201, *et seq.*). "Employers of tipped employees may consider tips as part of the tipped employees['] wages, but employers must pay a direct reduced minimum wage if they claim a 'tip credit.'" *Id.* (quoting 29 U.S.C. § 203(m) (footnotes omitted)).

The burden of proof is on the employer to "establish[] that it is entitled to claim the 'tip credit'" and "[u]nless the employer satisfies its burden of showing the applicability of the tip credit, the employee is 'entitled to the full minimum wage for every hour worked.'" *Ash*, 676 F. Supp. 2d at 1369 (quoting *Barcellona v. Tiffany English Pub, Inc.*, 597 F.2d 464, 467 (5th Cir. 1979)). An employer must meet three requirements "to satisfy the 'tip credit' in Section 203(m): (1) the tip credit must be claimed for qualified tipped employees; (2) the employees must receive proper notice of Section 203(m) and (3) all tips received by the employees must be retained by them." *Id.* (citing 29 U.S.C. § 203(m)).

Plaintiffs state that, during Phase I, Defendants "purported to compensate Plaintiffs on account of their hourly wages calculated by multiplying the number of hours worked by the reduced hourly rate applicable to tipped employees" when in fact "Plaintiffs were not actually paid [any hourly wage] for the hours worked." [ECF No. 100, p. 15 (internal quotation marks omitted)]. Plaintiffs note that almost every single one of the paychecks during Phase I reveals a net pay of '$0.00.'" *Id*. Plaintiffs state that during

this period they received only tips (and less than 100% of their tips) as compensation for their work. *Id.*

Plaintiffs also contend that, during Phase I, the amounts withheld by Defendants from their tips, purportedly to pay tax withholdings, were different from the amounts Defendants actually submitted to the government. According to Plaintiffs, Defendants "retain[ed] a flat percentage of the tips on account of tax withholding obligations." *Id.* at 16. However, these amounts were in excess of the amounts paid for tax withholdings. *Id.*[27]

> For instance,
>
> during Phase I of . . . Chavez's [e]mployment – during which [Defendants] converted his tips to cash and then returned to Plaintiffs only a flat 80% (sometime[s] 90%) of those tips while retaining a flat 20% (sometime[s] 10%) – [Defendants] retained more of the Plaintiff Chavez's gross tips, than [Defendants] deposited to government authorities on account of statutory deductions, according to their own tax reporting.

*Id.* Plaintiffs thus argue Defendants are not entitled to apply a tip credit.

---

[27]   Defendants contend that "Plaintiff Chavez, but not Plaintiff Diaz, claims that Defendants violated the tip credit provisions of the FLSA by deducting an arbitrary 20% from his nightly cash tips for taxes but paid less than that amount to the federal government." [ECF No. 104, p. 13]. Although the example cited in Plaintiffs' motion relates to Chavez, Diaz made a similar allegation in his supplemental affidavit: *See* [ECF No. 99, ¶ 36c ("During Phase I, the gross amounts retained by the Defendants was not the same as the amounts they deposited on account of statutory tax withholdings.")]. Thus, *both* Plaintiffs are claiming Defendants withheld amounts for tax purposes which were different than the amounts Defendants actually submitted to the government.

Defendants respond that "[t]he paystubs all clearly show the reduced tip credit minimum wage paid to Chavez and Diaz, the tip credit taken by Grill Enterprise[s, LLC], and the tips received by Chavez and Diaz." [ECF No. 104, p 10].

According to Defendants,

[t]he only reason that the pay stubs reflect[] [a] pay of net zero dollars ($0.00) is because, as is common with tipped employees, the wages they earned went to pay taxes on (1) the wages paid to them by Grill Enterprises[, LLC] and (2) the cash tips they earned and took home with them in cash each night, as required. **Statutory withholdings, as shown on Plaintiffs' paystubs, were withheld from Plaintiff's [sic] wages** to account for taxes owed by Plaintiff [sic] on (1) their wages paid by Grill Enterprises[, LLC] and (2) cash tips retained by Plaintiffs.

*Id.* (emphasis added; citation to the record omitted).

However, Plaintiffs maintain that they were not *actually* paid a reduced hourly wage and that the 10 to 20 percent withheld by Defendants for alleged tax purposes came from Plaintiffs' *tips*. [ECF Nos. 98, ¶ 37b ("During Phase I, . . . Defendants would retain or withhold 20% of my tips, and sometimes only 10% of the [t]ips; . . . . **Defendants represented to me that the reason they retained 20% (and sometimes only 10%) of my "[t]otal [t]ips" earned was so that they could comply with the statutory withholdings requirement[] pertaining to income taxes, Social Security, and Medicare tax**.") (emphasis added)); 99, ¶ 36b (same)].

Defendants deny retaining any portion of Plaintiffs' *tips* for tax withholdings. [ECF No. 104, p. 14 ("Plaintiffs were . . . well-aware [that] an additional 20% was not deducted for payroll taxes. . . . **The actual taxes withheld and paid to the federal government were**

**taken from Plaintiffs' wages, not their tips**, and are set forth on Plaintiffs' respective paystubs." (emphasis added))]. In his unsworn declaration, Sierra attests that:

> **Grill Enterprises[, LLC] did not retain any portion of Plaintiffs' tips on account of statutory tax withholdings, or other purposes**. Rather, **statutory withholdings, as shown on Plaintiffs' paystubs, were withheld from Plaintiffs' wages** to account for taxes owed by Plaintiffs on their wages by Grill Enterprises[, LLC] and cash tips retained by Plaintiffs.

[ECF No. 103-1, ¶ 11 (emphasis added)].

The disposition of this issue turns on credibility determinations and contested facts. If the trier of fact were to believe Plaintiffs' version of the facts, then Defendants did not pay any reduced hourly wage to Plaintiffs, withheld between 10 to 20 percent of Plaintiffs' tips, and remitted only some of this amount to the government for taxes. If, on the other hand, the trier of fact were to believe Defendants, then Defendants did not retain any portion of Plaintiffs' tips and instead paid tax withholdings (for both wages and tips) from Plaintiffs' reduced hourly rate. In any event, these disputed factual issues are for the jury to determine, not the Court.

### b. Phase I and II: Participation in Tip Pool by Alleged Non-Employees and Management Employees

Plaintiffs also contend that some of the individuals who participated in the tip pool were either non-employees or management employees. Plaintiffs state that "they were required to share their tips with both non-employees who worked at the restaurant off-the-books or as supposed 'independent contractors'" and "also had to 'tip out' at least one management employee." [ECF No. 100, p. 16].

"The FLSA does not prohibit employers from requiring tipped employees to share tips with other tipped employees through a tip pool." *Ash*, 676 F. Supp. 2d at 1369 (citing 29 U.S.C. § 203(m) and *Kilgore v. Outback Steakhouse of Fla., Inc.*, 160 F.3d 294 (6th Cir.1998)). However, "[o]nly tipped employees can participate in a valid tip pool." *Id.*

The only alleged tip pool participating non-employee who Plaintiffs identify by name is Cesar Pacheco. [ECF No. 108, p. 9]. Plaintiffs argue that Pacheco was not an employee of Defendants because he does not appear in pay or time-keeping records produced by Defendants or in Grill Enterprises, LLC's Employer's Quarterly Report filed with the Florida Department of Revenue. *Id.* at 9-10.

Defendants respond that "no non-employees . . . participated in the tip pool." [ECF No. 104, p. 16]. They then proceed to engage in an analysis of who is an "employee" and who is a "contractor" under the FLSA. *Id.* at 16-18 (discussing the economic realities test in *Freund v. Hi–Tech Satellite, Inc.*, 185 F. App'x 782, 783 (11th Cir. 2006)). Applying the factors of the economic realities test, Defendants conclude that Pacheco -- a dishwasher and occasional busser -- was an employee, as defined by the FLSA. *Id.* at 17.

In their motion, Plaintiffs argued, without citation to authority, that Defendants' tip pool was invalid "because [Plaintiffs] were required to share their tips with both non-employees who worked at the restaurant off-the-books or as supposed 'independent contractors.'" [ECF No. 100, p. 16]. In their reply, Plaintiffs argued that Pacheco was an undocumented worker and therefore could not lawfully participate in the tip pool. [ECF

No. 108, p. 10 ("There is no authority in support of the proposition that Defendants may use their lawful employees' tips to subsidize payment to undocumented workers of the Defendants.")].

Setting aside the propriety of waiting until the reply brief to cite any case law on this issue, none of the cases cited by Plaintiffs address the participation of an undocumented worker in a tip pool. Moreover, Plaintiffs have not cited to any record evidence establishing Pacheco's undocumented status. Instead, Plaintiffs rely on the fact that Pacheco's name does not appear in certain records (he was paid under the name VIP Services) and on *in limine* arguments made by Defendants' counsel and a proposed jury instruction. *Id.* at 10 (citing [ECF Nos. 82; 84]).

The Undersigned is not concluding that the participation of an undocumented worker in a tip pool can (or cannot) invalidate that tip pool. The Undersigned is merely stating that, based on this record -- where Plaintiffs have not established Pacheco's status as an undocumented worker and instead seek to rely on arguments made by Defendants' counsel in other non-summary judgment filings -- this issue should not be resolved at the summary judgment stage.[28]

---

[28]    During his deposition, Chavez testified that he had no knowledge concerning the citizenship status of bussers or bartenders:

> Q. Were any of the bussers or bartenders that you worked with not American citizens?

Plaintiffs also argue that the tip pool was invalid because at least one management employee participated in the tip pool. The only alleged management employee identified by Plaintiffs is Mariana Pinto. Plaintiffs cite Defendants' interrogatory responses, where they identified Pinto as an assistant manager. [ECF No. 108, p. 11 (citing ECF No. 98-4, p. 5)].

Defendants argue that Pinto was not an assistant manager during Plaintiffs' employment. [ECF No. 104, p. 20 ("[a]fter Plaintiffs left Grill Enterprises, in September 2020, Pinto was hired back as an assistant to the manager.")]. According to Defendants, "Pinto was a hostess/ bartender who earned $9-$11 per hour." *Id.* She

> did not direct the work of other employees" and "had no authority to: (1) hire or fire employees; (2) interview employees; (3) discipline employees; (4) recommend or suggest that employees be hired, fired, disciplined, promoted, advanced, etc.; (5) evaluate the performance of employees; or (6) decide employee's wages or raises, etc.

*Id.* at 19-20.

During his deposition, Chavez described Mariana Pinto's job duties as follows:

Q. What was Mariana's job at the restaurant?

A. She acted both as a manager and as a hostess. And sometimes as a bartender. Whatever was needed at the restaurant.

---

A. I don't know the status of every person there.

Q. Do you know the status of any of them?

A. No.

[ECF No. 96-2, p. 75:15-19].

[ECF No. 96-2, p. 114:24-115:2].

Under certain circumstances, a manager may participate in a tip pool:

A manager may participate in a tip pool if he or she has "more than de minimis service interaction with customers." *Wajcman v. Inv. Corp. of Palm Beach*, No. 07-80912-CIV, 2008 WL 783741, at *3 (S.D. Fla. Mar. 20, 2008) (Hurley, J.). Other courts in this District have held that only employees who "have no customer contact . . . fall outside the definition of tipped employees." *Pellon v. Bus. Representation Int'l, Inc.*, 528 F. Supp. 2d 1306, 1315 (S.D. Fla. 2007) (Moreno, J.), aff'd, 291 F. App'x 310 (11th Cir. 2008). The notion of a manager wearing two hats in a restaurant is not unprecedented. . . . Where . . . a manager has a mix of supervisory responsibilities and more than a de minimis customer-facing service role, such a manager may participate in a tip pool or, in this case, a service charge.

*Nelson v. MLB Hotel Manager, LLC*, No. 19-23730-CIV, 2020 WL 7481410, at *6 (S.D. Fla. Dec. 18, 2020), aff'd, No. 21-10181, 2022 WL 2733720 (11th Cir. July 13, 2022).

Here, Pinto's role at the restaurant during Plaintiffs' employment is disputed. Therefore, Plaintiffs are not entitled to summary judgment in their favor based on Pinto's participation in the tip pool.

### c.   Phase II: Three Percent Credit Card Surcharge

Lastly, Plaintiffs claim that, during Phase II, Defendants improperly charged Plaintiffs three percent for tips paid by credit cards. [ECF No. 100, p. 16].

Defendants respond that "Plaintiffs have no personal knowledge of the cost to Defendants of credit card charges and their claim that the actual amount was less than 3% is sheer speculation." [ECF No. 104, p. 20]. According to Defendants, the actual cost for credit card transactions was 3.4%. *Id.* ("[T]here were other costs associated with card

transactions including discount fees, transaction fees, chargebacks/ reversals, adjustments numerous other external and internal charges. Altogether, the card sales (including on tips received by card) resulted in an average cost to Grill Enterprises[, LLC] of approximately 3.4%.").

The source of this 3.4% number is the unsworn declaration of Yeison Gonzalez. [ECF No. 103-3]. It is unclear from his declaration what Gonzalez's role is at Grill Enterprises, LLC. Moreover, Defendants do not attach any merchant agreements or mathematical calculations supporting this 3.4% figure. In *Vega v. Ya Guan USA LLC*, for instance, the defendants submitted "a sworn declaration, merchant statements, and a point-of-sale chart to support its position it did not become enriched by withholding a percentage of Plaintiff's tips to pay credit card fees" and, even in that case, the Court determined the record did not support a summary judgment ruling. No. 19-24902-CIV, 2020 WL 13413699, at *3-4 (S.D. Fla. Sept. 23, 2020).

"[A]n employer may subtract a sum from an employee's charged gratuity which reasonably compensates it for its outlays sustained in clearing that tip, without surrendering its section 203(m) partial set-off against minimum wages." *Vega*, 2020 WL 13413699, at *3 (citing *Myers v. Copper Cellar Corp.*, 192 F.3d 546, 553 (6th Cir. 1999)). Plaintiffs are not entitled to summary judgment on this issue because they cite to no record evidence that the percentage charged by Defendants was unreasonable. *Id.* at *4 (finding summary judgment was not appropriate "where both parties present[ed]

competing characterizations of the evidence and advocate[d] for different definable time periods" and "Court [could not] conclude, as a matter of law, that [the restaurant's credit card] deductions [were] unreasonable and improper under the FLSA").

In sum, Plaintiffs have shown as a matter of law that enterprise coverage applies in this case and that Grill Enterprises, LLC was Plaintiffs' FLSA employer. Plaintiffs are not, however, entitled to summary judgment on the issue of whether Sierra is an FLSA employer or on their minimum wage claims. Plaintiffs have failed to show, through competent evidence, that Sierra exercised operational control over the restaurant. Additionally, genuine issues of material fact remain concerning Plaintiffs' minimum wage claims. Accordingly, Plaintiffs' summary judgment motion should be **granted in part** and **denied in part**.

## B.     Defendants' Renewed Summary Judgment Motion

As noted above, Defendants have moved for summary judgment in their favor on the following four issues: (1) Plaintiffs have not provided sufficient proof that Grill Enterprises, LLC meets the first prong of enterprise coverage; (2) "the record is absent any facts or evidence to support Plaintiffs' allegations that Defendants violated the minimum wage and/or tip credit provisions of the FLSA and/or that Defendants were not entitled [to] take a tip credit against the federal minimum wage," (3) "[a]s to the FMWA minimum wage claims (Count II) . . . these claims must be dismissed for the same reasons the FLSA minimum wage claims should be dismissed;" and (4) Chavez's FLSA retaliation

claim (Count III) fails as a matter of law because "the record is absent [of] any facts or evidence to support Chavez's allegations that Defendants retaliated against Chavez, in response to statutory [sic] protected complaints, in violation of the FLSA." [ECF No. 95, p. 2].

The District Court should **grant** summary judgment to Defendants on Chavez's retaliation claim (Count III) and **deny** Defendants' motion in all other respects.

### i.       Enterprise Coverage

For the reasons discussed above, the Court should find that Plaintiffs have met their burden of establishing enterprise coverage as a matter of law. Therefore, Defendants are not entitled to summary judgment in their favor on this issue.

### ii.       Minimum Wage Claims under the FLSA and FWMA

For the reasons discussed above, the Court should find that genuine issues of material fact preclude summary judgment for Defendants on Plaintiffs' minimum wage clams.

### iii.       Chavez's Retaliation Claim

Defendants also seek summary judgment on Chavez's retaliation claim. FLSA retaliation claims are subject to the following framework:

> A prima facie case of FLSA retaliation requires a demonstration by the plaintiff of the following: "(1) she engaged in activity protected under [the] act; (2) she subsequently suffered adverse action by the employer; and (3) a causal connection existed between the employee's activity and the adverse action." *Richmond v. ONEOK, Inc.,* 120 F.3d 205, 208–09 (10th Cir. 1997). If the employer asserts a legitimate reason for the adverse action, the plaintiff

may attempt to show pretext. *See id.* In demonstrating causation, the plaintiff must prove that the adverse action would not have been taken "but for" the assertion of FLSA rights. *See Reich v. Davis*, 50 F.3d 962, 965–66 (11th Cir. 1995).

*Wolf v. Coca-Cola Co.*, 200 F.3d 1337, 1342–43 (11th Cir. 2000).

There are two alleged protected activities in this case: (1) "[d]uring periods of his [e]mployment when he was paid no hourly wages at all, [Chavez] complained to his employer about the fact that he wasn't paid even the reduced minimum wage conditionally applicable for tipped employees" and (2) "[t]hroughout his employment, and as recently as one week prior to his termination, [Chavez] complained to his employer about the fact that he was required to bring his own cash to work in order to make change for customers of the restaurant." [ECF No. 105, p. 16].

Although the case law makes clear that an "[a]dverse employment action does not refer only to ultimate employment decisions, such as the decision to discharge an employee," *Shannon v. Bellsouth Telecommunications, Inc.*, 292 F.3d 712, 716 (11th Cir. 2002),[29] the only adverse action specifically identified by Plaintiffs is Chavez's termination. *See* [ECF No. 105, p. 18 ("[T]he last time [Chavez] complained to the employer occurred just one week prior to his termination.")].

---

[29]     The employee in *Shannon* brought a retaliation claim under Title VII. "[C]ourts have often relied on Title VII retaliation cases when assessing whether conduct constitutes material adverse action under the FLSA." *Smith v. Haynes & Haynes P.C.*, 940 F.3d 635, 649 n.6 (11th Cir. 2019).

Defendants are entitled to summary judgment on Chavez's first alleged protected activity -- complaints about not being paid a reduced minimum wage -- because Chavez cannot meet the causation prong.

Chavez must establish a causal connection between his protected conduct and the adverse action (his termination). "Under Eleventh Circuit precedent, a plaintiff satisfies the causation element by providing sufficient evidence that the decision-maker had knowledge of the protected activity and that there was a close temporal proximity between this awareness and the adverse action." *Vandesande v. Miami-Dade Cnty.*, 431 F. Supp. 2d 1245, 1256 (S.D. Fla. 2006) (citing *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004)); *Raspanti v. Four Amigos Travel, Inc.*, 266 F. App'x 820, 823 (11th Cir. 2008) ("A plaintiff can satisfy [the causation element] if she can prove a 'close temporal proximity' between the time her employer learned about her protected activity and her discharge.").

Chavez's deposition testimony shows that his complaints concerning the amounts reflected (or not reflected) on his paychecks were last made at the end of 2018:

Q. Now, you said at some point during your employment ending at the beginning of 2019 that the employer would issue you paychecks for zero value, correct?

A. That's correct.

Q. And that changed at the beginning of 2019?

A. That's correct.

**Q. Prior to the time that it changed in January of 2019, when was the last time that you objected to the fact or in any way complained or voiced a concern regarding the fact that your paychecks delivered zero dollars on**

**payday?**

**A. Well, that would have probably been in the last quarter of 2018 or something like that. Between mid[-]2018 and the end of the year 2018, maybe in the last quarter.**

**Q. And so once they started issuing checks that included a net payment to you, you stopped complaining about receiving zero money on account of the hours you worked, correct?**

**A. You mean zero dollars net. Correct.**

[ECF No. 96-2, p. 118:25-119:1-20 (emphasis added)].

Chavez was terminated approximately one year and five months after he last complained about the amounts reflected (or not reflected) on his paychecks. An approximately one-year and five months gap between the alleged protected activity and the alleged adverse action is too remote in time to support an FLSA retaliation claim. *See Raspanti*, 266 F. App'x at 823 (termination that took place seven months and three weeks after the defendant learned of the plaintiff's participation in an FLSA lawsuit was "too remote . . . to establish causation based on temporal proximity"). Plaintiffs have not proffered other evidence tending to show causation. *See Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004) ("If there is a substantial delay between the protected expression and the adverse action in the absence of other evidence tending to show causation, the complaint of retaliation fails as a matter of law.").

Defendants are also entitled to summary judgment on Chavez's retaliation claim based on complaints about having to keep cash in order to make change for customers. "Informal complaints to an employer regarding wage practices or any conduct that

49

implicates the FLSA qualify as protected activity." *Wigley v. W. Fla. Lighting, Inc.*, No. 8:04CV1524T27TGW, 2005 WL 3312319, at *4 (M.D. Fla. Dec. 7, 2005). However, "not every informal complaint made by an employee automatically qualifies as a protected expression that shields the employee from subsequent retaliation." *Robertson v. Interactive Coll. of Tech./Interactive Learning Sys., Inc.*, No. 1:14-CV-2728-MHC-JSA, 2017 WL 5197874, at *19 (N.D. Ga. Jan. 13, 2017), report and recommendation adopted, No. 1:14-CV-2728-MHC, 2017 WL 5247942 (N.D. Ga. Feb. 15, 2017), aff'd, 743 F. App'x 269 (11th Cir. 2018) (Title VII); *Franklin v. City of Homewood*, No. 2:07-CV-006-TMP, 2009 WL 10703685, at *19 (N.D. Ala. Aug. 19, 2009) ("Not every expression of displeasure about wages, however, constitutes a complaint protected under the [FLSA].").

Plaintiffs argue that Chavez's complaints about having to make change for customers was a protected expression under the FLSA because "whenever the Plaintiff is required to resort to his own resources to provide value for the benefit of the [restaurant], this necessarily 'cuts into the minimum . . . wages required to be paid' under the act, this is necessarily a complaint pertaining to the failure to pay a minimum wage." [ECF No. 105, p. 18 (quoting 29 CFR § 531.35)].

Chavez's complaints about having to make change for customers were not sufficiently specific to put Defendants on notice that Chavez was alleging that Defendants had violated the FLSA in failing to properly pay minimum wages.

Chavez's complaints were not about the amounts or manner in which he was being paid but were, instead, complaints about Defendants requiring Chavez to keep cash on hand. Plaintiffs have not shown that the nature of this complaint concerns a right protected by the FLSA. Accordingly, the Court should grant summary judgment in Defendants' favor on Chavez's retaliation count. *See Bennett v. Sch. Bd. of Madison Cnty., Fla.*, No. 4:06CV155-RH/WCS, 2007 WL 9735151, at *4 (N.D. Fla. May 29, 2007), aff'd sub nom. *Bennett v. Sch. Bd. of Madison Cnty.*, 265 F. App'x 876 (11th Cir. 2008) (granting summary judgment for employer where "[a] reasonable employer would not have understood [the plaintiff]'s complaint concerning payment for having driven the December 2004 field trip to be an assertion of rights under the FLSA. [The plaintiff]'s complaint thus was not an assertion of rights under the statute, and the adverse action taken against him, even if based on the complaint, was not a violation of the FLSA anti-retaliation provision.").

In sum, the Court should **grant** summary judgment in Defendants' favor on Chavez's retaliation claim (Count III) and **deny** Defendants' renewed summary judgment motion on all other counts.

## V.     Conclusion

Plaintiffs are entitled to summary judgment in their favor on the issue of enterprise coverage and on Grill Enterprises, LLC's status as Plaintiffs' FLSA employer. Defendants are entitled to summary judgment on Chavez's retaliation count. Genuine issues of

material fact preclude summary judgment on the remaining issues raised in the parties' respective renewed motions. The District Court should therefore **grant in part and deny in part** the parties' renewed summary judgment motions.

## VI.    Objections

The parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendations within which to file written objections, if any, with United States District Judge Marcia G. Cooke. Each party may file a response to the other party's objection within fourteen (14) days of the objection. Failure to file objections timely shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary in the interest of justice. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1 (2016).

**RESPECTFULLY RECOMMENDED**, in Chambers, in Miami, Florida, on August 15, 2022.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to:**
The Honorable Marcia G. Cooke
All Counsel of Record